James MUSENGO, Appellant,

v.

Thomas E. WHITE, Secretary
of the Army, Appellee.

No. 00–5347.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 9, 2001.

Decided April 16, 2002.

Charles W. Gittins argued the cause and filed the briefs for appellant.

Diane M. Sullivan, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were Roscoe C. Howard Jr., U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney.

Before: SENTELLE, RANDOLPH and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

Plaintiff James Musengo challenges the Army's refusal to remove an Officer Evaluation Report from his military record. The District Court granted summary judgment against Musengo, concluding that the Army Board for Correction of Military Records did not act arbitrarily or capriciously in refusing to expunge the report. We affirm.

I

Musengo is currently a major in the United States Army Reserve. During the period at issue in this case, he was a captain on active duty, instructing members of the Reserve Officer Training Corps and teaching courses in military science at the University of Akron. In July 1992, Musengo received an Officer Evaluation Report (OER) assessing his performance from June 24, 1991 to June 23, 1992. We have recently described in detail the officer rating system employed by the Army at the time of Musengo's evaluation, see Cone v. Caldera, 223 F.3d 789, 790–91 (D.C.Cir.2000), and we therefore sketch it only briefly here.[1]

An OER is used to evaluate an officer's performance and career potential. See Army Regulation (AR) 623–105, at¶ 1–6(a) (Apr. 30, 1992). At least two of the officer's superiors prepare the OER. The first is a "rater," who directly supervises the rated officer and is familiar with his or her day-to-day performance. Id. ¶ 3–4. The second is a "senior rater"—here, Colonel Joseph M. Barrow—who is charged with "evaluat[ing] the rated officer from a broad organizational perspective," including measuring the officer's potential for promotion relative to the larger group of officers under the senior rater's command. Id. ¶ 3–10(a).

The OER form contains blanks for both a numerical and a narrative assessment of the rated officer. In Part VII(a), the senior rater is to check one of a column of nine blocks that compare "the rated offi-

---

1. In 1998, the Army altered its regulations and OER form, including the block rating system discussed in the text *infra*. *See* Army Regulation 623–105 (Apr. 1, 1998). The citations in this opinion refer to the regulations in effect at the time of Musengo's disputed OER.

cer's potential with all other officers of the same grade." *Id.* ¶ 4–16(b).[2] The rater's evaluation is to be based on the premise that in a representative sample of officers Army-wide, the distribution of ratings "will approximate a bell-shaped normal distribution pattern." *Id.*[3] According to the regulations, this means "that in a representative sample of 100 officers of the same grade or grade grouping (Army-wide) only one officer can reasonably be expected to be placed in the top block." *Id.* ¶ 4–16(c). Another two are expected to fall in the second block, and so on. *See id.* fig. 4–4. The center block, block five, is expected to be the rating achieved by 60 officers out of a representative 100. *Id.*

Once the OER is completed, the Army compares the senior rater's assessment of the individual officer to the senior rater's rating history for all officers of the same grade—known as the senior rater's "profile." *Id.* ¶ ¶ 2–5,4–16(d)(5)(a). By comparing a specific officer's OER to his senior rater's profile, the Army can discern whether that officer performed above, at, or below the "center-of-mass"—i.e., the median ranking—of all officers ranked by the same senior rater. Moreover, by comparing the profiles of different senior raters, the Army can determine whether one rater's "rating tendency" is more lenient than that of another. *Id.* ¶ 4–16(d)(5)(a); *see id.* ¶ 9–7(f).

On the OER that is in dispute in this case, Musengo's senior rater, Colonel Barrow, gave Musengo a second-block rating—corresponding to the top 2–3% of Army captains according to the expected distribution pattern set out in the regulations. *Id.* fig. 4–4. Within Barrow's personal profile for the relevant time period, however, this placed Musengo below the center-of-mass of the captains Barrow rated. Of 54 captain reports completed by Barrow during the period, 32 contained top-block ratings, 20 contained second-block ratings, and 2 placed captains in the third block. *See* Joint Appendix (J.A.) at 32.

Concerned that a below-center-of-mass rating would hurt his chances of promotion, Musengo contacted Barrow, who told Musengo that he had intended to rate Musengo at center-of-mass, and that he had thought the second-block rating was in fact his center-of-mass. Armed with this information, Musengo appealed to the Officer Special Review Board (OSRB), which has the power to correct substantive inaccuracies in an OER. AR 623–105, at ¶ 9–2(i). After the OSRB denied Musengo's initial request to delete the senior rater's numerical rating from his OER, Musengo obtained a supporting letter from Barrow and resubmitted his request. In the letter, Barrow stated: "It was my clear intent to give CPT Musengo a strong center of mass evaluation on this OER and also get him promoted." J.A. at 11. Musengo also provided the OSRB with the transcript of a deposition in which Barrow reiterated that "it was my desire that [Musengo] be placed in center of mass," and

---

2. In *Cone,* the Army described the column as containing ten blocks. Army Br. at 5, *Cone.* The Army now states that the column contains nine blocks, Army Br. at 2 n.4, *Musengo,* and this appears to be correct. What could be construed as two equally weighted blocks in the center of the column is instead a single block into which the Army expects 60% of the evaluations of a representative sample to fall. *See* AR 623–105, at fig. 4–4.

3. In a normal distribution, most of the data points are "clustered near the mean, and the density or relative frequency of the numbers decreases with increasing distance from the mean." DAVID W. BARNES & JOHN M. CONLEY, STATISTICAL EVIDENCE IN LITIGATION 140 (1986). "If the frequencies with which the numbers in the normal population appear as the result of random experiments are plotted on a graph, the figure resembles a bell-shaped curve." *Id.*

that "I believed that my center of mass was a two block at that time." J.A. at 19. The OSRB denied Musengo's second appeal. Thereafter, Musengo filed three more appeals to the OSRB, all of which were likewise unsuccessful.

Following the denial of his requests by the OSRB, Musengo appealed to the Army Board for Correction of Military Records. The Correction Board is the "next agency in the Army's redress system," AR 623–105, at ¶ 9–5(f), and has the power to direct changes in military records in order to correct "material error or injustice," AR 15–185, at ¶ 1–8(b).[4] The Board concluded that "the contested OER appears to represent a fair, objective and valid appraisal of [Musengo's] demonstrated performance and potential, and represents the considered opinion and objective judgment of the senior rater at the time of preparation." ABCMR Decision at 4 (March 30, 1994), *reproduced at* J.A. 5, 8. Because it was "not convinced that the senior rater was not aware that his center of mass was within the top block at the time he rated the applicant," the Board denied Musengo's appeal. *Id.*

Musengo then filed the instant action in the United States District Court for the District of Columbia. He alleged that the Correction Board's decision was arbitrary and capricious in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), and sought removal of the disputed OER from his military record. The district court granted summary judgment in favor of the Army, and this appeal followed.

## II

■ Under Army regulations, OERs are presumed to be "administratively correct" and to "[r]epresent the considered opinions and objective judgment of the rating officials at the time of preparation." AR 623–105, at ¶ 5–32(a). An applicant petitioning the Correction Board to amend or delete a report has the burden of "produc[ing] evidence that establishes clearly and convincingly" that the "presumption of regularity" should not apply, and that "[a]ction is warranted to correct a material error, inaccuracy, or injustice." *Id.* ¶ 9–7(a) (citing *id.* ¶ 5–32); *see also Frizelle v. Slater*, 111 F.3d 172, 178 (D.C.Cir.1997). Although this court has jurisdiction to review decisions of the Correction Board,[5] we do so under an "unusually deferential application of the 'arbitrary or capricious' standard" of the APA. *Kreis v. Secretary of the Air Force*, 866 F.2d 1508, 1514 (D.C.Cir.1989); *see Cone*, 223 F.3d at 793; *Kidwell v. Department of the Army*, 56 F.3d 279, 286 (D.C.Cir.1995). We review de novo the district court's ruling, on cross-motions for summary judgment, that the Correction Board did not act arbitrarily or capriciously in this case. *See Cone*, 223 F.3d at 793.

Musengo offers three arguments in support of his contention that the Board acted unlawfully in denying his application for correction. We consider these arguments below.

## A

■ Musengo's first contention is that his rating should be vacated because sen-

---

4. The Correction Board operates within the Office of the Secretary of the Army pursuant to 10 U.S.C. § 1552(a), which provides that the secretary of a military department acting through a civilian board "may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice."

5. *See Cone*, 223 F.3d at 793; *Frizelle*, 111 F.3d at 176; *Dickson v. Secretary of Defense*, 68 F.3d 1396, 1401 n. 6 (D.C.Cir.1995); *Kreis v. Secretary of the Air Force*, 866 F.2d 1508, 1512 (D.C.Cir.1989) (citing *Chappell v. Wallace*, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983)).

ior rater Barrow violated AR 623–105, at ¶ 4–16(b). That regulation states that a senior rater's evaluation "is based on the premise that in a representative sample of 100 officers of the same grade or grade grouping (Armywide), the relative potential of such a sample will approximate a bell-shaped normal distribution pattern." Musengo contends that because Barrow's evaluations did not approximate a bell-shaped curve, the senior rater violated the governing regulation and the Board acted arbitrarily in refusing to delete the second-block rating from his OER.

We rejected the same argument in *Cone*. As we explained in that case, although the regulations direct the senior rater to base his or her ratings on the "premise" that evaluations of an Army-wide representative sample will approximate a bellshaped curve, "they do not *require* adherence to a bell-shaped curve" for the evaluations of any individual rater's ratees in a given rating period. *Cone*, 223 F.3d at 793. Moreover, even if Barrow was lax in adhering to the regulation's premise, the Army "anticipates, and compensates for, the fallibility of individual raters by requiring that each rater's personal profile . . . be included in the OER of each officer he or she reviews." *Id.* at 794. The profile permits reviewers "to place the rated officer's OER in perspective by revealing the senior rater's general rating tendency," AR 623–105, at ¶ 4–16(d)(5)(a), including his or her "tendency to inflate or deflate ratings," *id.* ¶ 9–7(f). Accordingly, as in *Cone*, it was reasonable for the Correction Board to refuse to alter the plaintiff's OER. *See Cone*, 223 F.3d at 794.[6]

### B

Musengo's second contention is that the Correction Board's refusal to vacate his rating was arbitrary and capricious in light of Barrow's letter and deposition, which averred that Barrow had made a mistake in issuing that rating: although the senior rater had placed Musengo in the second block, he stated that he had done so under the mistaken belief that the second block was his center-of-mass. Musengo does not dispute that under the regulations, OERs are presumed to represent "the considered opinions and objective judgment of the rating officials at the time of preparation," AR 623–105, at ¶ 5–32, and that he needed clear and convincing evidence to overcome that presumption, *id.* ¶ 9–7(a). But he contends that Barrow's statements were sufficient to satisfy that regulatory standard.

There is, however, another regulation at issue here as well. Paragraph 5–32(b)(2) of AR 623–105 provides that statements from rating officials that they "did not intend to rate [an officer] as they did" will "not be used to alter or withdraw a report." The reason for this rule is that "statements from rating officials often reflect. retrospective thinking, or second thoughts, prompted by an appellant's non-selection or other unfavorable personnel action claimed to be the sole result of the contested report." *Id.* app. N, at ¶ N–2(b)(3). As we explained in *Cone*, the rule is based on the "understanding that raters may attempt to retract otherwise accurate assessments when requested to do so by their disappointed officers." *Cone*, 223

---

6. In support of his argument, Musengo cites an opinion of the Court of Federal Claims, *Richey v. United States*, 44 Fed. Cl. 577 (1999), which remanded a Correction Board decision where a senior rater's evaluations did not approximate a bell-shaped curve. We are not certain whether *Richey* intended to announce a general rule of law or merely to hold that the Board acted arbitrarily in light of the specific facts of that case. However, even if *Richey* intended the former, this court's decision in *Cone* necessarily controls the disposition of the instant appeal.

F.3d at 794. This regulation was a reasonable basis for the Correction Board's decision to reject Barrow's statements as insufficient to overcome the presumption of regularity. *See id.*[7]

 In rebuttal, Musengo contends that there is an exception to ¶ 5–32(b)(2) that permits reliance on post hoc statements in the case of "information which was unknown or unverified when the report was prepared," and which "is so significant that it would have resulted in a higher or lower evaluation had it been known or verified when the report was prepared." AR 623–105, at ¶ 5–32(c)(1)-(2). But it is clear in context that this regulation applies to new information concerning the quality of a ratee's performance, rather than to a rater's sudden recognition of his own profile.[8] To read the exception as encompassing the latter would permit it to swallow the rule

against accepting after-the-fact testimonials.

In addition to the OER's presumption of regularity, Barrow's contemporaneous rating history provides further evidence that he was aware that the top block was his center-of-mass at the time he placed Musengo in the second block. As the Correction Board noted, the OSRB determined that for the five months preceding Musengo's contested OER, Barrow "had rendered 23 OER's ... with 17 top block ratings and only six second block ratings; and that the senior rater did 12 OER's the week of the applicant's OER with eight top block, three second block, and one third block checks." ABCMR Decision at 3.[9] This series of contemporaneous ratings, heavily weighted toward the top block, is further reason to discount Barrow's suggestion that he was unaware that the top block was his center-of-mass.[10]

**7.** Musengo alludes to the fact that Barrow apparently rated nine captains twice over a one-year period, *see* J.A. at 32 (OER page containing Barrow's profile), and suggests that this may explain why Barrow did not realize that his center-of-mass had changed from the second to the top block. But the inclusion of those nine reports did not change Barrow's center-of-mass. It would still be at the top block even if we assumed that all nine were for top-block captains and removed them from his profile. *See id.*

**8.** *See also* AR 623–105 app. N, at ¶ N–2(b)(3) ("[C]laims by rating officials that they did not intend to evaluate as they did will not, alone, serve as the basis of altering or withdrawing an evaluation report. Rating officials may, however, provide statements of support contending the discovery of new information that would have resulted in an improved evaluation had it been known at the time of report preparations.").

**9.** Still further evidence is the fact that Barrow "restarted" his profile immediately prior to the rating period covered by Musengo's OER. ABCMR Decision at 2. Army regulations permit a senior rater to restart his profile to ensure that his intended evaluations are properly conveyed to selection boards and personnel managers. AR 623–105, at ¶ 3–12.1. The

Correction Board concluded that the fact that Barrow had recently restarted his profile undermined his contention that he "was not aware that his center of mass was within the top block at the time he rated the applicant." ABCMR Decision at 4.

**10.** Musengo contends that the Correction Board should not have considered this data because the OSRB opinion in which it was contained was not included in the certified administrative record filed with the district court by the Army. That failure of certification, however, is not fatal. *Cf.* 5 U.S.C. § 706 (stating that in reviewing agency action "due account shall be taken of the rule of prejudicial error"). The Correction Board decision makes clear that the OSRB opinion was part of the "evidence of record" before the Board, ABCMR Decision at 2–3, as would be expected since the purpose of Musengo's appeal to the Board after his rejection by the OSRB was to seek review by "the next agency in the Army's redress system," AR 623–105, at ¶ 9–5(f). Army regulations gave Musengo the right to obtain a copy of the OSRB decision, *id.*, and he conceded at oral argument that he did obtain one. Moreover, at no time during the numerous proceedings before the OSRB, Correction Board, district court, or this court has Musengo contended that the data contained in the OSRB opinion is inaccurate.

## C

 · Finally, Musengo contends that this case is distinguishable from *Cone* because of the different kind of relief he seeks: Cone asked for an *amendment* of his OER, while Musengo seeks only its *removal* from his military record.[11] We did note in *Cone* that the "knowledge that 'correcting' Cone's grades would ultimately require us to reassess the relative rankings of his entire cohort ... confirms the wisdom of deferring to the reasonable judgment of the Correction Board." *Cone,* 223 F.3d at 795. The difference in requested remedy, however, cannot justify a different conclusion as to whether Musengo's rating violated Army regulations. Nor does that difference truly sidestep the "quagmire" of serial reassessments that we sought to avoid in *Cone. Id.*

Were we to vacate Musengo's second-block rating because Barrow wrongly thought the second block was his center-ofmass, would we not have to do the same for the twenty other captains Barrow rated in that block, all of whom could make similar complaints? And if we did that, what would become of those officers Barrow placed in the top block? Whatever Barrow thought was his center-of-mass, he clearly thought that those he placed in the top block were superior to those he placed in the second, including Musengo.[12] Yet with the second-block officers' ratings expunged, the top-block group would lose the advantage of the comparison. Moreover, were we to begin this game of falling dominos for those officers rated by Barrow, we would open the door to similar challenges from officers rated by every other rater whose profile did not match the bell-shaped curve that Musengo insists is required by the regulations. That, of course, is precisely the quagmire we refused to enter in *Cone.*

## III

The Army does not dispute that James Musengo rendered meritorious service. But there is no warrant for concluding that his rating in the second block of the OER—which placed him among the top 2–3% of all captains Army-wide but not among the top 1%—underrated his performance. As in *Cone,* 223 F.3d at 796, Musengo's underlying complaint is that he failed to get the full benefit of the inflated grading curve employed by his senior rater, whose ratees, like the children of Lake Wobegon, were apparently all above average.[13] As that failure does not render the Army's refusal to expunge Musengo's record arbitrary or capricious, the district court's grant of summary judgment is

*Affirmed.*

---

11. Before the Correction Board, Musengo sought removal only of the senior rater's numerical ranking. *See* ABCMR Decision at 2. In this court, Musengo seeks removal of the entire OER. *See* Compl. at 8.

12. The OSRB found that: "[T]he SR [senior rater] intended to give the appellant [a] ranking lower than those officers designated as top block. The SR may have lost control of his profile, however, the fact remains he rendered both top block and second block reports clearly rank ordering the officers he rated." *See* Musengo Br. at 9–10 (quoting OSRB). Neither Musengo's brief, nor Barrow's letter in support of Musengo, disputes that Barrow intended to rank Musengo below the officers he placed in the top block. *See* J.A. at 14.

13. *See* GARRISON KEILLOR, LAKE WOBEGON U.S.A. (Minn. Pub. Radio 2000), *quoted at* http://prairiehome.org/catalog/catalog_014.htm.