**Kenneth L. LEBRUN, Plaintiff,**

v.

**Gordon R. ENGLAND, Secretary of the Navy, Defendant.**

**Civil Action No. 00–1391(RBW).**

United States District Court, District of Columbia.

July 11, 2002.

Melvin White, McDermott, Will & Emery, Washington, DC, Kevin Matz, McDermott, Will & Emery, New York City, for Plaintiff.

Edith M. Shine, Esq., U.S. Attorney's Office, Washington, DC, for Defendant.

## MEMORANDUM OPINION

WALTON, District Judge.

This matter is before the Court on Defendant's Motion to Dismiss or, in the alternative, for Summary Judgment ("Def.'s Mot.") and Plaintiff's Cross–Motion for Summary Judgment.[1] Upon consideration of the parties' submissions, the Court concludes that defendant's motion to dismiss must be denied because plaintiff timely filed his complaint with this Court in compliance with 28 U.S.C. § 2401(a) (2000), and the equitable doctrine of laches is not a bar to the filing of this action. However, because the Court must defer to the agency's substantive decision, *Musengo v. White*, 286 F.3d 535, 538 (D.C.Cir.2002);

---

**1.** The Court notes that the following pleadings were also reviewed in connection with the issuance of this Opinion: Defendant's Opposition to Plaintiff's Cross–Motion for Summary Judgment and Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss or, in the alternative for Summary Judgment ("Def.'s Reply"); Plaintiff's Memorandum of Law (I) In Opposition to Defendant's Motion to Dismiss, or in the alternative, for Summary Judgment and (II) In Support of Plaintiff's Cross–Motion for Summary Judgment ("Pl.'s Memo."); Plaintiff's Reply Memorandum of Law in further support of Plaintiff's Cross–Motion for Summary Judgment ("Pl.'s Reply"); Plaintiff's Statement of Undisputed Material Facts in support of Plaintiff's Cross–Motion for Summary Judgment; Plaintiff's Declaration of Kevin Matz (I) In Opposition to Defendant's Motion to Dismiss, or in the alternative, for Summary Judgment and (II) In Support of Plaintiff's Cross–Motion for Summary Judgment; Plaintiff's Rule 7.1(h) Response to Defendant's Statement of Undisputed Material Facts and Counterstatement of Material Facts as to Which there Exists a Genuine Issue; Defendant's Reply to Plaintiff's Response to Defendant's Statement of Undisputed Material Facts and Defendant's Response to Plaintiff's Statement of Undisputed Material Facts; Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Leave to File a Sur–Reply; and Defendant's Surreply ("Def.'s Surreply").

*Kreis v. Sec'y. of the Air Force,* 866 F.2d 1508, 1514–15 (D.C.Cir.1989), provided that the decision was not arbitrary, capricious, an abuse of discretion, contrary to law or regulation, or unsupported by substantial evidence, 5 U.S.C. § 706(2) (2000), it must award defendant summary judgment. This result is demanded since the Court finds that the defendant exercised his discretion in a reasonable manner in relying on the review of the Naval Academy's decision to dismiss the plaintiff's petition that was conducted by the Board for Correction of Naval Records ("BCNR"), and there is otherwise no basis to set aside the defendant's decision under 5 U.S.C. § 706(2).[2]

## I. *Background*

A brief recitation of the facts of this case is a necessary prelude to the Court's analysis of the legal challenges raised in the parties' pleadings. The plaintiff, Kenneth LeBrun, was appointed as a midshipman to the United States Naval Academy ("Academy") on June 27, 1962, and was scheduled to graduate from the Academy in 1966. Administrative Record ("A.R.") at 191, 721. Prior to his discharge from the Academy, the plaintiff excelled at the Academy and was elected Class President and Chairman of the Honor Committee during his second class year, or his junior year. *Id.* at 304–05. However, on December 18, 1965, the plaintiff was alleged to have committed a "false muster", which is

defined as the fraudulent act of indicating an individual present when he was not, in fact, present.[3] *Id.* at 160. The plaintiff and the defendant disagree as to the circumstances surrounding this incident.

The plaintiff contends that the incident arose from the muster that was scheduled to follow the evening meal (the "Evening Muster"), and not the muster scheduled at the end of the day (the "Midnight Muster") as alleged by the defendant. *Id.* at 306. The plaintiff asserts that when the Evening Muster was conducted late, his newly-assigned roommate, Midshipman Bruce Dyer ("Dyer"), was not present and the midshipman conducting the muster, Midshipman Ray Gadberry ("Gadberry"), was reluctant to sign the muster sheet. *Id.* At Gadberry's request, the plaintiff allegedly began to search for Dyer and was told by another midshipman that Dyer had been present in the area but had left after the muster was not conducted at the scheduled time. *Id.* The plaintiff asserts that the Academy's Regulation Book explicitly stated that a midshipman signing the muster sheet had to have knowledge of another midshipman's presence, but this did not have to be personal knowledge, as the Honor Code entitled one midshipman to rely upon the word of another midshipman. *Id.* at 306–07. The plaintiff subsequently signed the Evening Muster sheet representing that Dyer was present. *Id.* at 307. Later, during the Midnight Mus-

---

2. The Secretary of the Navy ("Secretary") is authorized under 10 U.S.C. § 1552(a) to correct military records when "he considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a) (2000). "This correction process is undertaken by 'boards of civilians of the executive part of [the] military department [involved].'" *Smith v. Dalton,* 927 F.Supp. 1, 6 (D.D.C.1996) (quoting 10 U.S.C. § 1552(a)). In the instant case, the civilian board is referred to as the Board for Correction of Naval Records ("BCNR").

3. Former Rear Admiral Sheldon H. Kinney, the former Commandant of Midshipmen at the Academy at the time of this incident ("Commandant Kinney"), defined what a false muster was and explained that:

"[s]ubmitting a false muster report is a serious act. In a naval context, one must be able to rely completely and totally on muster reports, especially at sea or in combat where such reports are critical to determine whether a man has been lost overboard, has been killed or wounded, or is otherwise missing. A midshipman's training emphasized this." A.R. at 163.

ter, the plaintiff asserts that Gadberry advised him that Dyer was absent and they both agreed to report him as absent for the Midnight Muster. *Id.* The plaintiff is adamant that he never signed the Midnight Muster inspection board. *Id.*

As indicated, the defendant asserts that the disciplinary proceedings were initiated because of the Midnight Muster. *Id.* at 186. Defendant also disagrees with plaintiff's version of the facts in other respects. The defendant alleges that during the Midnight Muster, Gadberry found that Dyer was absent from his room, the plaintiff was awakened, and Gadberry questioned him about Dyer's whereabouts. *Id.* at 186–87. The plaintiff allegedly told Gadberry that Dyer must be in the area and he went back to sleep. *Id.* Gadberry, assisted by Midshipman Nickolai Kobylk ("Kobylk"), then searched the area, and after speaking to Midshipman William Crenshaw, Jr. ("Crenshaw"), who was believed to know where Dyer was, returned to awake the plaintiff. *Id.* After the plaintiff was awakened, Kobylk informed him about the discussion with Crenshaw and the plaintiff allegedly took the muster inspection board from Gadberry and stated that he would assume the responsibility of signing it. *Id.* At this point, the plaintiff allegedly erased a mark that indicated Dyer's absence and signed the inspection board. *Id.* Gadberry subsequently returned and told the plaintiff that he thought Dyer should be marked absent, but the plaintiff allegedly responded that he was somewhere in the vicinity and went back to sleep. *Id.*

Thereafter, Gadberry went to the Battalion Office, placed an absent mark after Dyer's name, erased the plaintiff's name and signed his own name on the inspection board. *Id.*

It is undisputed that upon the plaintiff's return from Christmas holiday leave two weeks later, his company officer, Lieutenant Umstead ("Umstead"), advised the plaintiff that an investigation has been commenced regarding Dyer's absence and the plaintiff's false muster.[4] *Id.* at 308–09. The following chain of events are, however, also disputed.

According to the plaintiff, several weeks after Umstead's investigation was initiated, he received a message instructing him to go to a specified location to meet the Superintendent.[5] *Id.* at 309. Upon entering the room where he had been told to report, the plaintiff became aware that the Superintendent, the Commandant, his Battalion Officer, and Umstead were all present. *Id.* The plaintiff was allegedly asked several questions by the Superintendent regarding the incident and, according to the plaintiff, was not given an opportunity to address, clarify the situation, or defend himself in any way. *Id.* at 309–10. After only a few minutes from when the meeting started, the plaintiff states that he was dismissed and informed that he had just "had a trial." *Id.* at 310. The plaintiff asserts that he was not informed of the specific charges he was facing and because he had "been trained to trust, respect and obey his superiors," he did not dispute their authority.[6] *Id.* at 310. The plaintiff

4. The plaintiff, however, also alleges that Umstead advised him that the investigation involved the Evening Muster. In addition, the plaintiff claims that Umstead later informed him that he was exonerated after an investigation had been conducted and that he would submit a report to that effect to the Superintendent. A.R. at 308–09.

5. The Superintendent is responsible for the operation of the entire Academy, while the Commandant is responsible for the professional development of the midshipmen and reports directly to the Superintendent. Def.'s Reply at 4 n. 2.

6. The plaintiff also alleges that he was confused by the events because, serving as the Chairman of the Honor Committee during his

further alleges that later that same day, he met with the Superintendent privately and was informed that the Superintendent was recommending to the Secretary that he be dismissed from the Academy. *Id.* at 311. The Superintendent allegedly informed the plaintiff that such a recommendation would automatically result in a dismissal, and that if the plaintiff did not agree to resign, he would personally ensure that the plaintiff would receive a dishonorable discharge. This, he was told, would have the likely effect of prohibiting him from being admitted to another reputable college and being able to obtain employment. *Id.* at 311–12. After this meeting, the plaintiff states that he spoke with an officer, who represented that he was the Academy's attorney, who informed him that the Superintendent's statement that a dismissal is automatically granted upon the Superintendent's recommendation was correct. *Id.* at 312. The plaintiff further claims that the Academy's attorney failed to advise him that he could appeal a dismissal decision. *Id.* The plaintiff was instructed to draft a resignation statement, but, according to the plaintiff, after he did so the Superintendent rejected it and provided the plaintiff with a different version prepared by the Superintendent's staff, which plaintiff signed. *Id.* at 312–13.

The defendant's version of the events that resulted in the plaintiff's dismissal from the Academy, was compiled by the BCNR in 1993 and 1994, and relies upon all records involving this incident that could be located at that time, in addition to written statements that were submitted by several individuals.[7] The most notable declaration submitted to the BCNR was from former Commandant Kinney. Although he was not able to independently recall any of the facts and circumstances surrounding this incident due to the significant lapse of time, he was, however, able to provide guidance about how such matters were normally handled. *Id.* at 164–68. The former Commandant stated that such matters involving fraud could be handled under either the Academy's conduct system or the more punitive honor system, but because a false muster was considered a serious matter, it was proper to handle this violation in the conduct system. *Id.* at 167. The former Commandant also stated that the normal procedure employed for such an infraction was for a violation report to be reviewed by several layers of an accused midshipman's chain of command. *Id.* at 160–66. Once the Commandant received a report, he stated that "it was an unwavering practice" to privately interview the midshipman and ask the midshipman to discuss "anything that

second class year, he had assumed that he would be permitted to present his defense at a formal trial in front of the Student Honor Committee. A.R. 311.

7. The BCNR was able to locate the following documents in its review of the plaintiff's petition: a February 4, 1965, memorandum from the Commandant to the Superintendent recommending that the Superintendent accept the plaintiff's resignation; a February 4, 1966, Midshipman Personal Evaluation Summary Report from Umstead; an unsigned, unserialized January 19, 1966, letter from the Superintendent to the Secretary recommending the acceptance of the plaintiff's resignation; an unsigned, unserialized January 21,

1966, letter from the Superintendent to the plaintiff's mother; the plaintiff's midshipman records indicating that the Superintendent's letter to the Secretary and his letter to the plaintiff's mother were both sent on February 21, 1966; a February 17, 1966, letter from the Superintendent to the Bureau of Naval Personnel regarding this incident; the plaintiff's Armed Forces of the United States Reports of Transfer or Discharge indicating that he was honorably discharged on April 1, 1966; and the Class "A" log indicating that the plaintiff was charged with fraud on December 18, 1965 and subsequently submitted his resignation from the Academy. Def.'s Mot. at 2–3.

might serve to exonerate him, or mitigate or extenuate his actions." *Id.* at 162. The Commandant could then either dismiss the charges, impose some form of punishment, or send the case forward to the Superintendent with a recommendation for a discharge. *Id.* at 163. However, prior to recommending a discharge to the Secretary, the former Commandant stated that he always informed the midshipman of his intent to make that recommendation and the midshipman's option to resign. *Id.* Finally, the former Commandant discussed the Superintendent's policy regarding meeting with a midshipman accused of a disciplinary violation. *Id.* at 165–66. The former Commandant stated that he was always present at such meetings, often along with the midshipman's battalion and company officers. *Id.* at 166. The former Commandant described the Superintendent as "friendly and outgoing with the midshipmen," and during the course of such disciplinary hearings/meetings the Superintendent "wanted to hear what the midshipman had to say in defense, extenuation or mitigation."[8] *Id.* Upon reviewing all of the evidence of record, a majority of the BCNR found "no error or injustice warranting corrective action" and that the plaintiff "committed misconduct, [and] elected to halt further discharge processing by voluntarily submitting a conditional resignation." *Id.* at 744–45. After " 'personally review[ing] the entire record [and] carefully consider[ing] both the majority and minority reports,' the Secretary approved the Majority's findings and conclusions, and declined to afford the plaintiff any relief."[9] Def.'s Mot. at 7 (quoting A.R. at 710).

---

8. In fact, the former Commandant recalled that the Superintendent "actively disliked disciplining midshipmen and tended to be lenient when he could." A.R. at 166.

9. When the plaintiff filed his original petition with the BCNR, the Superintendent, his two

## II. *Analysis*

### A. *Motion to Dismiss*

It is axiomatic that this Court's jurisdiction to entertain the plaintiff's complaint must be established as a threshold matter. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). As the Supreme Court stated in *Ex Parte McCardle*, 74 U.S. 506, 7 Wall. 506, 514, 19 L.Ed. 264 (1868),

[w]ithout jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause. And this is not less clear upon authority than upon principle.

The defendant argues that the plaintiff's complaint should be dismissed because it is barred by both the statute of limitations and by the equitable doctrine of laches. A brief review of the procedural history of the proceeding that was conducted by the BCNR and the administrative review that was conducted thereafter is critical to the resolution of these issues.

In March 1993, nearly twenty-six years after his resignation from the Academy, the plaintiff submitted his petition to the BCNR requesting that he be awarded a degree from the Academy and that all references to his resignation be expunged from his records. A.R. at 367. Despite the delay in filing the petition, the BCNR, on January 31, 1995, determined that it was in the interests of justice to waive the applicable three-year statute of limitation as permitted by 10 U.S.C. § 1552(b) (2000).[10] As already indicated, the BCNR

---

legal officers, plaintiff's Company Officer Umstead, and plaintiff's Battalion Officer were all deceased. A.R. at 166.

10. The BCNR's review authority is governed by 10 U.S.C. § 1552(b), which requires a claimant to file a petition within three years

then issued a divided report and recommendation, with the majority concluding that the plaintiff's petition should be denied. *Id.* at 720–48. After reviewing the entire record and considering both the majority and minority reports issued by the BCNR, on February 22, 1995, the Secretary adopted the BCNR majority's findings and conclusions and denied plaintiff any relief. *Id.* at 710–14. The plaintiff subsequently filed his Complaint for Declaratory and Injunctive Relief with this Court on June 12, 2000.

### (1) *Statute of Limitations Challenge*

Judicial review of the actions of an agency, such as the Department of Navy, is provided for in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. Congress has established a six-year statute of limitations for the initiation of civil suits against the United States in 28 U.S.C. § 2401(a), which states, in part, that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." The District of Columbia Circuit Court stated in *Spannaus v. United States Dep't of Justice,* 824 F.2d 52 (D.C.Cir.1987),

> [a] cause of action against an administrative agency 'first accrues,' within the meaning of § 2401(a), as soon as (but not before) the person challenging the agency action can institute and maintain a suit in court. Tautologically, a suit cannot be maintained in court—and a cause of action does not 'first accrue'— until a party has exhausted all adminis-

trative remedies whose exhaustion is a prerequisite to suit.

*Id.* at 56–57 (citing *Crown Coat Front Co. v. United States,* 386 U.S. 503, 510–19, 87 S.Ct. 1177, 18 L.Ed.2d 256 (1967); *Impro Prod., Inc. v. Block,* 722 F.2d 845, 850 (D.C.Cir.1983), *cert. denied,* 469 U.S. 931, 105 S.Ct. 327, 83 L.Ed.2d 264 (1984)).

The predicate for defendant's assertion that plaintiff's claim is time barred is his reliance on *Hurick v. Lehman,* 782 F.2d 984 (Fed.Cir.1986). The Federal Circuit in *Hurick* held that an agency's review of a plaintiff's discharge, or an allegation that a resignation was coerced, as is alleged in this case, is not a separate or independent claim from the underlying injury, *i.e.,* the discharge or coerced resignation, and thus the right to obtain judicial review accrues at the time of the underlying injury. *Id.* at 987. However, this clearly is the minority viewpoint. While the District of Columbia Circuit has not directly considered this issue,[11] it is evident that of those Circuit Courts that have addressed the question, an overwhelming majority have found that the right to obtain judicial review of a Board of Corrections' decision under the APA, 5 U.S.C. §§ 701–706, accrues at the time of the final agency decision, or the exhaustion of all administrative remedies, rather than at the time when the underlying discharge or alleged coerced resignation occurred. *See Blassingame v. Sec'y of Navy,* 811 F.2d 65, 71 (2d Cir.1987), *rev'd on other grounds after remand,* 866 F.2d 556 (1989); *Dougherty v. United States Navy Bd. for Corr. of Naval Records,* 784 F.2d 499, 501–02 (3d

---

after he discovers an error or injustice. However, the BCNR "may excuse a failure to file within three years of discovery [of the error or injustice] if it finds it to be in the interest of justice." *Id.*

**11.** This Court has not overlooked *Walters v. Sec'y of Defense,* 725 F.2d 107 (D.C.Cir.1983),

where the District of Columbia Circuit found that a class action seeking to upgrade discharges was barred by the statute of limitations. However, the judicial review that was being sought there was of the underlying discharge and not of an agency's review of the discharge decision.

Cir.1986); *Geyen v. Marsh*, 775 F.2d 1303, 1306 (5th Cir.1985), *aff'd*, 849 F.2d 1469 (1988); *Smith v. Marsh*, 787 F.2d 510, 512 (10th Cir.1986).

This Court finds several compelling reasons to follow the majority of the Circuits. First, while the defendant asserts that "[s]ince Plaintiff is directly challenging the proceedings that resulted in his 1966 discharge, regardless of how he brings his claim, his claim is time barred," Def.'s Mot. at 25, such reasoning ignores the fact that judicial review of a claim of wrongful discharge is distinct and independent from judicial review of a claim challenging the Correction Board's review of the underlying discharge decision. As the Second Circuit in *Blassingame* stated, "[t]hough the factual record in some if not many instances may be similar for both types of claims, the focus of the former is on the action of discharge officials whereas the focus of the latter is on the action of the [Correction] Board." 811 F.2d at 72. "By obtaining judicial review of a Correction Board decision, a veteran therefore does not circumvent the statute of limitations for directly challenging the discharge itself in a judicial proceeding, but instead secures review of a separate claim for review of the agency action." *Id.* at 73 (citing *Geyen*, 775 F.2d at 1306; *Smith*, 787 F.2d at 511–12).

Furthermore, application of the minority rule expressed in *Hurick* may present circumstances where a discharged veteran would not have any opportunity for judicial review of a Correction Board's decision. As the Second Circuit hypothesized in *Blassingame,* a veteran may timely file a petition for review within three years after discharge, but if the agency issues an adverse ruling greater than six years after the veteran's discharge, the veteran would be precluded from judicial review of that decision. 811 F.2d at 71–72. In contrast, the majority rule provides an equitable

solution that allows all discharged veterans exactly six years to obtain judicial review of an adverse Correction Board decision. *Id.*

Finally, as more fully set forth below in this Court's discussion of the summary judgment motion, Congress mandated, pursuant to 5 U.S.C. § 706, that a district court must set aside an agency action if it finds it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." This review of the agency's decision, however, is generally limited to consideration of the administrative record. *Id.; see Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744–45, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985); *Dougherty*, 784 F.2d at 501. Therefore, "since an action for correction of records involves judicial review based on the administrative record, the statute of limitations should begin to run when the administrative record is complete. That is, the action is not ripe for review until the correction board has rendered its final decision." *Smalls v. United States*, 87 F.Supp.2d 1055, 1059 (D.Haw.2000) (citing *Dougherty*, 784 F.2d at 501).

"The Supreme Court stated in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), that 'a survey of our cases shows that judicial review of a final agency action by an aggrieved person will not be cut off unless there is a persuasive reason to believe that such was the purpose of Congress.'" *Dougherty*, 784 F.2d at 501 (quoting *Abbott*, 387 U.S. at 140, 87 S.Ct. 1507). Thus, while the purported underlying injury in this case took place in 1966, when the BCNR chose to waive the review limitation period of 10 U.S.C. § 1552(b) and address the merits of the plaintiff's claim, the limitation period for judicial review of the BCNR's decision on the merits started to run when its decision became final on Feb-

ruary 22, 1995, which was when the Secretary issued his ruling by adopting the BCNR's majority report. This result is consistent with the authority Congress gave to the BCNR to waive a statute of limitation barred challenge to a military discharge if reaching the merits of the challenge is "in the interest of justice." 10 U.S.C. § 1552(b). Congress, having given the BCNR this waiver authority, surely would have said that judicial review of the BCNR's decision on the merits in such situations was unavailable if that is what it intended. The absence of such a proscription is a clear indication that Congress envisioned that the BCNR's substantive ruling would be subject to judicial review under the APA just like any other agency action. *Blassingame*, 811 F.2d at 71 ("There is no 'clear and convincing evidence' of such a purpose by Congress."). Thus, there is no "persuasive reason" to believe that Congress intended to preclude judicial review of a BCNR decision on the merits that was rendered following a 10 U.S.C. § 1552(b) statute of limitation waiver once that decision became final upon its adoption by the Secretary. *See Abbott Laboratories*, 387 U.S. at 140, 87 S.Ct. 1507; *Dougherty*, 784 F.2d at 501. The defendant's statute of limitation challenge is therefore rejected.

#### (2) *Equitable Doctrine of Laches Defense*

■ "The laches doctrine, of course, reflects the principle that 'equity aids the vigilant, not those who slumber on their rights,' and is designed to promote diligence and prevent enforcement of stale claims." *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 843 (D.C.Cir. 1982) (quoting *Powell v. Zuckert*, 366 F.2d 634, 636 (D.C.Cir.1966)). In considering a defense of laches, this Court must determine whether there was both a lack of diligence by the plaintiff and unreasonable delay that was prejudicial to the defen-

dant. *Gull Airborne*, 694 F.2d at 843; *Geyen*, 775 F.2d at 1310.

The defendant asserts that the plaintiff's claim should be dismissed pursuant to the equitable doctrine of laches because the plaintiff's delay in bringing this suit is unreasonable, and that the "delay prejudiced the government by further degrading the recall of witnesses." Def.'s Mot. at 28–29. As support for this proposition, the defendant focuses his argument on the significant time delay between the plaintiff's discharge in 1966 and the plaintiff's subsequent petition to the Correction's Board in 1993, noting that a number of witnesses were deceased by the time the plaintiff filed his petition. *Id.* Moreover, the government complains about the additional five and half year delay that occurred after the Secretary issued his decision and the plaintiff initiated this action. *Id.*

■ However, as discussed above, the plaintiff's right of action accrued at the time of the Secretary's decision. This Court's review of that decision does not involve a *de novo* inquiry, but is based on the administrative record that was considered by the Secretary. *Blassingame*, 811 F.2d at 72; *Geyen*, 775 F.2d at 1310–11. In *Gull Airborne*, the District of Columbia Circuit dealt with a similar claim from a defendant that the plaintiff's delay in filing suit resulted in a loss of evidence or witnesses. 694 F.2d at 844–45. In rejecting the laches defense, the court noted that "[t]he government's own regulations require documentation of all actions taken with respect to [the subject of the agency review]" and that the government's claimed prejudice from the death of a witness was "cured" by that documentation. *Id.* Here, the defendant apparently believed that it had an adequate record to review the merits of the plaintiff's challenge of his dismissal from the Academy, as demonstrated by the BCNR's decision

to waive the statute of limitations and reach the merits, and by ultimately denying the challenge. And the record considered by the defendant is exactly what the Court must review. For the defendant to now claim that he will be prejudiced by judicial review of the record he found adequate to reach his decision is, at best, disingenuous. Therefore, because this Court's review is limited to the administrative record that was before the Secretary when he made his decision, the defendant's claim that the equitable doctrine of laches should bar this Court's review of his decision must be rejected. *Blassingame*, 811 F.2d at 72; *Geyen*, 775 F.2d at 1310–11.

## B. *Motion for Summary Judgment*

### (1) *Standard of Review*

Judicial review of an administrative agency's decision is authorized by the APA, 5 U.S.C. §§ 701–706, and this Court may only set aside agency actions, findings, and conclusions that are found to be in violation of 5 U.S.C. § 706(2). Thus, the scope of the Court's review is solely to determine whether the Secretary's decision to adopt the BCNR's recommendation to deny the plaintiff's petition was arbitrary, capricious, an abuse of discretion, contrary to law or regulations, or unsupported by substantial evidence. 5 U.S.C. § 706(2).[12] When reviewing a decision by a military Correction Board, a Court must do so under an "unusually deferential application of the 'arbitrary or capricious' standard of the APA." *Musengo*, 286 F.3d at 538 (citing *Kreis*, 866 F.2d at 1514); *Cone v. Caldera*, 223 F.3d 789, 792–93 (D.C.Cir.2000). Accordingly, the Court must determine only whether the Secretary's decision is flawed for one or more of the reasons enumerated in 5 U.S.C. § 706(2), not whether the decision was correct. *Kreis*, 866 F.2d at 1511. "Like appellate courts, district courts do not duplicate agency fact-finding efforts. Instead, they address a predominantly legal issue: Did the agency 'articulate a rational connection between the facts found and the choice made'?" *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1096 (D.C.Cir.1996), *cert. denied*, 519 U.S. 1077, 117 S.Ct. 737, 136 L.Ed.2d 676 (1997) (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)). Under this unusually deferential standard of review, the decision of the Secretary must be affirmed.[13]

### (2) *Discussion*

■ The defendant asserts that summary judgment is proper because the Secretary's decision was procedurally sound, well supported by the record, and not con-

---

**12.** 5 U.S.C. § 706(2) states that "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."

**13.** The District of Columbia Circuit recognized that "[p]erhaps only the most egregious decisions may be prevented under such a deferential standard of review. Even if that is all the judiciary can accomplish, in reconciling the needs of military management with Congress's mandate for judicial review, then do it we must; it is not for us but for Congress to say whether the game is worth the candle." *Kreis*, 866 F.2d at 1515.

trary to law. Def.'s Mot. at 29–38. After a thorough review of the administrative record, including the BCNR majority and minority opinions and the Secretary's decision, and what process was due the plaintiff, the Court must grant the defendant's Motion for Summary Judgment because the defendant's decision-making process was not deficient in the face of the facts and circumstances of this case.

### (a) *The Secretary's Decision–Making Process*

Upon receiving the plaintiff's petition twenty-seven years after the incident that led to his resignation and honorable discharge from the Academy, the BCNR began a thorough review, as required by law, that included generating an extensive administrative record, reviewing the evidence submitted, and making both majority and minority findings. Def.'s Mot. at 31 (citing 32 C.F.R. §§ 723.2(b), 723.6(c)). In its majority opinion, the BCNR relied upon "the presumption that [Academy] officials performed their duties in a regular and proper manner, and that [p]etitioner's resignation was submitted voluntarily and of his own free will." A.R. at 741. This presumption, embodied in 32 C.F.R. § 723.3(e)(2) (2002), allows the BCNR to "rel[y] on a presumption of regularity to support the official actions of public officers and, in the absence of substantial evidence to the contrary, will presume that they have properly discharged their official

duties." Applicants who petition the BCNR for relief must rebut by clear and convincing evidence the presumption of 32 C.F.R. § 723.3(e)(2) "that military administrators discharge their duties correctly, lawfully, and in good faith." [14] *Cone*, 223 F.3d at 792–93 (citing *Frizelle v. Slater*, 111 F.3d 172, 177 (D.C.Cir.1997)); *see Musengo*, 286 F.3d at 538; *see also Orloff v. Willoughby*, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953) (strong policies compel the court to allow the widest possible latitude to the armed services in their administration of personnel matters).

Despite the lengthy passage of time, and the fact that the BCNR is not an investigatory body, 32 C.F.R. § 723.2(b), the BCNR was able to generate a rather comprehensive record, and it released those records to the plaintiff.[15] A.R. at 231. The BCNR solicited statements from several individuals, including the former Commandant of the Academy, regarding the plaintiff's dismissal from the Academy, while the plaintiff submitted statements from himself, former midshipman Gadberry,[16] and several other former midshipmen who, although they did not have personal knowledge of the false muster incident, opined that the plaintiff's conduct should have been dealt with under the honor system, rather than under the harsher conduct system. *Id.* Upon reviewing "all official records found in Plaintiff's case, all submissions made by Plaintiff or his counsel to the BCNR, all

**14.** This presumption is derived from 32 C.F.R. § 723.3(e)(2), which states, in part, that "[t]he Board relies on a presumption of regularity to support the official actions of public officers and, in the absence of substantial evidence to the contrary, will presume that they have properly discharged their official duties."

**15.** See footnote 7 above for a list of the documents the BCNR reviewed.

**16.** The plaintiff also submitted an Affidavit from Gadberry, who stated that the muster in

question was the Evening Muster and not the Midnight Muster. The BCNR noted that Gadberry's statement was not only inconsistent with a previous statement he had given to a member of the BCNR, but contrary both to a letter submitted by Kobylk that indicated Gadberry told him that the plaintiff, not knowing where Dyer was, signed and submitted the Midnight Muster board, and the documents generated contemporaneous to this incident. A.R. at 740–41.

existing Navy correspondence concerning Plaintiff's case or searches for documents, and all additional materials collected by the BCNR," the BCNR issued a divided opinion represented by both a majority and a minority report. Def.'s Mot. at 33. The BCNR then forwarded both reports to the Secretary. A.R. at 749. The Secretary "personally reviewed the entire record," and "carefully considered both the majority and minority reports." Def.'s Reply at 12 (quoting A.R. at 710). Subsequently, and after "giv[ing] petitioner's allegations very serious and thoughtful consideration ... [, the Secretary found] that petitioner's qualified resignation from the Naval Academy in February 1966, was not the result of an error or injustice warranting relief under 10 U.S.C. 1552." A.R. at 714.

### (b) *Plaintiff's Due Process Claim*

It is undisputed that "service academies are subject to the Fifth Amendment and that cadets and midshipmen must be accorded due process before separation." *Andrews v. Knowlton,* 509 F.2d 898, 904 (2d Cir.1975) (citations omitted). However, "[w]hat process is due is not [always] so clear ... [and] except in certain standard

situations, 'due process is flexible and calls for such procedural protections as the particular situation demands.'" *Wimmer v. Lehman,* 705 F.2d 1402, 1404 (4th Cir. 1983) (quoting *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). Due process dictates that prior to being *involuntarily* dismissed from the Academy, a midshipman "must have a hearing, be apprised of the specific charges against him, and be given an adequate opportunity to present his defense both from the point of view of time and the use of witnesses and other evidence."[17] *Andrews,* 509 F.2d at 904–05. For discharges pursuant to 10 U.S.C. § 6962, this hearing is otherwise known as an Administrative Conduct Hearing.[18] *See Love v. Hidalgo,* 508 F.Supp. 177, 182 (D.Md.1981) (explaining that the Administrative Conduct Hearing is conducted pursuant to USNA COMDTMIDN[19] Instruction 1620.10). The court in *Love,* 508 F.Supp. at 180, explained the procedural aspects of 10 U.S.C. § 6962 (2000) as follows:

> [o]nce the Superintendent of the USNA determines that a midshipman should be discharged for unsatisfactory conduct, Section 6962 of Title 10 of the United States Code sets forth the procedures

17. Although the plaintiff alleges that "in certain instances, [a midshipman is entitled to] 'seek advice or retain counsel to assist him in preparing his defense at the hearing,'" Pl.'s Mot. at 34 (quoting *Hagopian v. Knowlton,* 470 F.2d 201, 212 (2d Cir.1972); *Crowley v. United States Merch. Marine Acad.,* 985 F.Supp. 292, 299 (E.D.N.Y.1997)), this is not one of those instances because the proceeding was non-criminal and was informal in nature and the plaintiff was "mature and educated, [with] knowledge of the events [to] enable him to develop the facts adequately through available sources." *Andrews,* 509 F.2d at 905 (quoting *Wasson,* 382 F.2d at 812).

18. The plaintiff asserts that his alleged false muster should have been processed in the honor system, rather than the conduct system, relying on his own past experience with the

honor system and statements submitted from former midshipmen familiar with the honor system, but who had no personal knowledge of this particular incident. However, it appears from the Administrative Record and former Commandant Kinney's statement that the Commandant had the discretion to process certain matters involving fraud in the conduct system and that given the seriousness of a false muster, proceeding pursuant to a conduct proceeding cannot be deemed by the Court as an abuse of discretion. A.R. at 70–86, 712.

19. Although the nature of this document is not specifically identified in *Love,* it appears from an examination of the administrative record in this case that it is a disciplinary rule promulgated by the Commandant of the Academy.

that must then be followed in order to effect such a discharge. The Superintendent is required to 'submit to the Secretary of the Navy in writing a full report of the facts.' 10 U.S.C. § 6962(a). The midshipman upon whom the report is made is then to 'be given an opportunity to examine the report and submit a written statement thereon.' 10 U.S.C. § 6962(b). At that point, the decision is to be made by the Secretary of the Navy under the following statutory guidelines: 'If the Secretary believes, on the basis of the report and statement, that the determination of the Superintendent ... is reasonable and well founded, he may discharge the midshipman from the Naval Academy and from the naval service.' 10 U.S.C. § 6962(b). Clearly, § 6962 applies to a midshipman who chooses to challenge allegations of misconduct. However, the plaintiff's decision to submit his resignation to avoid the consequences of a dishonorable discharge obviated the need for further disciplinarian proceedings, including the need for a conduct hearing. As the Tenth Circuit held in *Parker v. Board of Regents of Tulsa Junior College*, 981 F.2d 1159 (10th Cir.1992), a tenured professor voluntarily relinquished her property interest in her employment and was not entitled to a hearing prior to deciding whether to resign, or not do so and therefore avoid the consequences of further disciplinary proceedings. *Id.* at 1162–63. As the Tenth Circuit concluded, once the resignation was submitted, there was no right to a hearing "because the plaintiff chose to end her employment without a hearing and not to avail herself of the available due process procedures." *Id.* at 1163. The same consequences occurred when the plaintiff submitted his resignation to the Academy, provided that the resignation was not coerced as alleged by the plaintiff.

A former serviceman attempting to correct his military record has the burden of submitting clear and convincing evidence that public officials have failed to properly perform their official duties and therefore must overcome the presumption of regularity accorded the official actions of public officers. *Musengo*, 286 F.3d at 538; *Cone*, 223 F.3d at 792–93; *see also* 32 C.F.R. § 723.3(c)(2). The Court therefore presumes that the BCNR majority's finding that the plaintiff's "resignation was submitted voluntarily and of his own free will", A.R. at 741, is accurate because of the "strong but rebuttable presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Frizelle*, 111 F.3d at 177 (citations omitted). In that regard, the majority of the BCNR recognized that although there was "a paucity of evidence which would rebut [the plaintiff's] contentions," they nevertheless had to rely on the "presumption that [the Academy] officials performed their duties in a regular and proper manner." A.R. at 741. And as for its position that the plaintiff's resignation was not coerced, the BCNR majority referenced former Commandant Kinney's declaration wherein he stated "that the meetings which were regularly conducted on these matters were not coercive, and the Superintendent was not the sort of individual who would take such action, but was exactly the opposite sort of individual." *Id.*

In opposition to the BCNR's finding on whether his resignation was coerced, the plaintiff has simply submitted his bald, uncorroborated assertion that his resignation was coerced and that he was not afforded his due process rights. Because what plaintiff has presented does not amount to clear and convincing evidence to rebut the presumption that the Academy's officials discharged their duties in a lawful manner, the Court must credit the BCNR majority's findings that the plaintiff "committed misconduct, elected to halt further

discharge processing by voluntarily submitting a conditional resignation, and received the benefit of his bargain when that resignation was accepted." *Id.* at 744; *see Musengo*, 286 F.3d at 538–541; *Cone*, 223 F.3d at 792–93; *Frizelle*, 111 F.3d at 177. As former Commandant Kinney explained in his declaration, a resignation "had certain benefits for the midshipman as opposed to an involuntary discharge" since a "midshipman could truthfully state that he had resigned, leaving the impression that he had left the Academy on his own accord." *Id.* at 163. The BCNR majority also noted that the plaintiff avoided a substantial active duty military obligation and received seven free semesters of college education. *Id.* at 744–45. The United States Court of Claims in discussing allegations of coerced resignations in *Christie v. United States,* 207 Ct.Cl. 333, 518 F.2d 584 (1975), stated that the "court has repeatedly upheld the voluntariness of resignations where they were submitted to avoid threatened termination for cause." *Id.* at 588. As pointed out by the *Christie* court, "[t]he fact remains, plaintiff had a choice. [He] could stand pat and fight. [He] chose not to. Merely because plaintiff was faced with an inherently unpleasant situation in that [his] choice was arguably limited to two unpleasant alternatives does not obviate the voluntariness of [his] resignation." *Id.* at 587.

As further support for his proposition in this case, the plaintiff alleges that the meeting with the Superintendent, Commandant, his Battalion Officer, and his Company Officer

> was held in a rigid military manner, [and he] had not attempted to 'argue' with the officers or the Superintendent. Having been trained to trust, respect and obey his superiors, [he] did not dispute Superintendent Kauffman's or the other officers' authority. In addition, because he had not been permitted to speak, [he] could not ask questions, provide any explanations or defend himself in any way.

Pl.'s Mot. at 8 (citing A.R. at 310–11). The Fourth Circuit in *Wimmer* found a similar argument unpersuasive, because "an individual of a midshipman's presumed intelligence, [is] selected because he is expected to be able to care for himself and others, often under difficult circumstances ..." 705 F.2d at 1404–5. In the instant case, the plaintiff had been at the Academy for approximately three and a half years when the events occurred, he was an undefeated varsity letter winner in boxing, had been selected as Company Commander in the fall semester of his first class year, and was elected Class President and Chairman of the Honor Committee during his second class year. *See* Pl.'s Mot. at 4 (citing A.R. at 304–05). The plaintiff was therefore a seasoned midshipman with achievements that demonstrate that he was assertive and keenly aware of the Academy's disciplinary process. Moreover, the Secretary noted that it was "completely implausible that petitioner could be intimidated by Academy officials into submitting a qualified resignation so close to graduation for an offense he knew he did not commit." A.R. at 713. The Court has no basis for rejecting the Secretary's position.

Regarding the sanction the plaintiff received, although the plaintiff asserts that under the Academy's Honor Code he was entitled to rely upon the word of another midshipman, the investigating officers at the Academy, the BCNR majority, and the Secretary found that the conduct that the plaintiff was accused of committing "is a serious offense which, if proven, warranted discharge from the [Academy]." *Id.* at 744. The Court must extend great deference to the military in its supervision and discipline of military personnel. The Supreme Court has long held that "such complex, subtle, and professional decisions as to the composition, training, ... and con-

trol of a military force are essentially professional military judgments." *United States v. Shearer*, 473 U.S. 52, 58, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985) (quoting *Chappell v. Wallace*, 462 U.S. 296, 302, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973))); *see also Orloff v. Willoughby*, 345 U.S. 83, 93, 73 S.Ct. 534, 97 L.Ed. 842 (1953); *United States v. Stanley*, 483 U.S. 669, 682, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987); *Brown v. Glines*, 444 U.S. 348, 360, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980); *Rostker v. Goldberg*, 453 U.S. 57, 64–65, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981); *Goldman v. Weinberger*, 475 U.S. 503, 508, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986). This Court must therefore reject any attempt to have it substitute its own judgment for the Naval Academy's decisions regarding what discipline is proper and necessary for infractions committed by midshipmen. On this record, no due process violation has been demonstrated, and, therefore, the Secretary's affirmance of the Academy's findings and disciplinary decision cannot be set aside by this Court.

### (c) *Plaintiff's Request for Additional Discovery*

Finally, the plaintiff asserts that he is entitled to certain discovery that the defendant has failed to produce, which he claims is an alternative basis for denying the defendant's summary judgment motion.[20] Pl.'s Reply at 21. It is a well established rule that "[j]udicial review of agency decisions is limited to the administrative record compiled by the agency at the time of decision except (1) where the agency has engaged in improper or bad faith behavior, or (2) where the record is so limited that it precludes effective judicial review." *TOMAC v. Norton*, 193 F.Supp.2d 182, 194 (D.D.C.2002) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 457–58 (D.C.Cir.1994)). The moving party must demonstrate a "strong showing of bad faith or improper behavior" by the agency for this Court to order additional discovery outside of the existing administrative record. *TOMAC*, 193 F.Supp.2d at 194–95 (quoting *Overton Park*, 401 U.S. at 420, 91 S.Ct. 814). As grounds for his position that discovery should be ordered in this case, the plaintiff relies on "inconsistencies" between a draft declaration that had been prepared by the BCNR's investigator for former Commandant Kinney based on an interview between the two and the final declaration that Kinney signed. Pl.'s Reply at 22–24. However, the Court credits the defendant's explanation for the discrepancies. As explained by the defendant, the discrepancies "reflect modifications [former] Commandant Kinney made to the draft as a result of further information he recollected between the time he was first interviewed by [the BCNR investigator] in October of 1993 and the time he signed his final declaration in January of 1994." Def.'s Surreply at 1–2.

A more significant reason why the plaintiff's discovery request should not delay a decision on the defendant's summary judgment motion is plaintiff's failure to demonstrate the relevancy of the discrepancies. *Simpkins v. Shalala*, No. 95–1095, 1997 WL 459850, at *1 (D.D.C. July 31, 1997)

---

**20.** Specifically, the plaintiff requests: the official Main Office Conduct Log and any additional official Class "A" Conduct Log maintained by Watch Personnel at the Academy's Main Office; the plaintiff's qualified resignation; the Report of Conduct; the Academy's policy concerning liberty for the evening before Christmas leave in 1965–66; any additional witness interview notes and draft declarations prepared by the BCNR's investigator; and all of the plaintiff's performance evaluations. Pl.'s Reply at 23–24.

(court instructed plaintiff that discovery must be relevant and restricted to the actions of the administrative agency). In fact, the plaintiff's candid acknowledgment that discovery is unnecessary for the resolution of his cross motion for summary judgment, shows the irrelevancy of the information. And while the plaintiff proclaims the "significan[ce of the] inconsistencies," Pl.'s Reply at 22, his failure to even attempt to articulate the basis for this conclusory assertion is telling. In addition, the Court is unable to fathom why the inconsistencies should have altered the Secretary's decision.[21] *Ned Chartering & Trading, Inc. v. Republic of Pakistan and Ministry of Food and Agric.*, 294 F.3d 148, 152–53 (D.C.Cir.2002) (Circuit court upheld district court's denial of request for a discovery extension for failure to demonstrate how further discovery would produce any issues of material fact) (citing *Moore v. United States*, 213 F.3d 705, 710 n. 3 (D.C.Cir.2000) ("a district court may deny discovery requests when additional facts are not necessary to resolve the summary judgment motion")). Further delay in resolving this case so that discovery can be conducted is therefore unwarranted.

## III. *Conclusion*

In summary, although the Court concludes that the defendant's statute of limitations and laches challenges must be rejected, he is entitled to summary judgment. His decision to deny the plaintiff's petition was not arbitrary, capricious, an abuse of discretion, contrary to law or regulation, or unsupported by substantial evidence. Moreover, the plaintiff has failed to submit substantial evidence to rebut the presumption of regularity that must be afforded the administrative actions and decisions he is challenging. Accordingly, the defendant's summary judgment motion must be granted and the plaintiff's cross-motion for summary judgment must be denied.[22]

## *ORDER*

Upon consideration of the Defendant's Motion to Dismiss or, in the alternative, for Summary Judgment and the Plaintiff's Cross–Motion for Summary Judgment, and for the reasons set forth in the Memorandum Opinion accompanying this Order, it is hereby,

**ORDERED** that Defendant's Motion to Dismiss is **DENIED;** and it is

**FURTHER ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED;** and it is

**FURTHER ORDERED** that the Plaintiff's Cross–Motion for Summary Judgment is **DENIED.**

21. The Court also notes that the administrative record indicates that the defendant has conducted numerous searches for any and all documents in the Navy's possession related to the plaintiff. A.R. at 26, 33, 36, 112–13, 120, 179–80, 360. While the plaintiff implies that there are several conspiratorial reasons why the defendant is purportedly withholding certain documents, the Court appreciates that it is not a surprise that certain documents cannot be located given that over thirty-five years have elapsed since the plaintiff's resignation. In any event, the Court concludes that the plaintiff has failed to demonstrate that further discovery would lead to information that would warrant setting aside the Secretary's decision.

22. An Order consistent with the Court's ruling accompanies this Memorandum Opinion.